FILED
2020 Sep-29  AM 08:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **Michelle A. Abrams,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.:  2:19-cv-01033-AMM** |
| ) | |
| **Social     Security     Administration,** ) | |
| **Commissioner,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Michelle A. Abrams brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record and the parties' briefs, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On March 2, 2016, Ms. Abrams protectively filed an application for benefits under Title II of the Act alleging disability as of March 3, 2015. R. 10, 18, 63, 167-74. Ms. Abrams's application alleges disability due to posttraumatic stress disorder, depression, hypertension, and hypothyroidism. R. 63. She has at least a high school

education and has past relevant work experience as an inventory specialist, forklift driver, court advocate, customer service representative, and order puller. R. 16-17.

The Social Security Administration ("SSA") initially denied Ms. Abrams's application on May 19, 2016. R. 10, 62-75. On May 26, 2016, Ms. Abrams filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 10, 85-86. That request was granted. R. 90-91. Ms. Abrams's representative submitted a hearing brief on January 23, 2018. R. 235-37. Ms. Abrams received a hearing before ALJ Perry Martin on January 31, 2018. R. 10, 34-61. On June 12, 2018, the ALJ issued an unfavorable decision, finding that Ms. Abrams was not disabled from March 3, 2015 through the date of the decision. R. 10-18. Ms. Abrams was 48 years old at the time of the ALJ decision. R. 62.

Ms. Abrams appealed to the Appeals Council. R. 142. After the Appeals Council denied Ms. Abrams's request for review of the ALJ's decision, R. 1-4, the ALJ's decision became the final decision of the Commissioner and subject to this court's review.

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or

profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id. Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R.   § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis

proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

The ALJ determined that Ms. Abrams meets the insured status requirements of the Act through June 30, 2020. R. 12. Next, the ALJ found that Ms. Abrams had not engaged in substantial gainful activity since her alleged onset date of disability, March 3, 2015. R. 12. The ALJ decided that, since that date, Ms. Abrams has had the following severe impairments: depressive and anxiety disorders. R. 12. As to Ms. Abrams's diagnosis of hypertension and a thyroid disorder, the ALJ found that "there is no indication that this condition causes more than minimal work-related limitation." R. 12-13. Additionally, the ALJ found that while Ms. Abrams has a diagnosis of anemia, the medical evidence "does not show that" Ms. Abrams "has more than minimal work-related limitations arising from this condition." R. 13. Overall, the ALJ determined that Ms. Abrams did not have "an impairment or

combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 14.

The ALJ found that Ms. Abrams had the "residual functional capacity to perform a full range of work at all exertional levels" with certain nonexertional limitations. R. 15. The ALJ determined that Ms. Abrams should avoid all exposure to hazardous machinery. R. 15. Additionally, the ALJ found that during a workday, Ms. Abrams can:

> 1. Understand and remember short and simple instructions, but is unable to [do] so with detailed or complex instructions. 2. Do simple, routine, repetitive tasks, but is unable to do so with detailed or complex tasks. 3. Have no more than occasional contact with the general public, and occasional contact with co-workers. 4. Deal with changes in work place, if introduced occasionally and gradually, and are well-explained. 5. Perform jobs dealing primarily with things, not people. 6. Occasionally miss 1 to 2 days of work per month due to impairments.

R. 15.

According to the ALJ, Ms. Abrams is "unable to perform any past relevant work," she is a "younger individual," and she has "at least a high school education," as those terms are defined by the regulations. R. 16-17. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 17. Because Ms. Abrams's "ability to perform work at all exertional levels has

been compromised by nonexertional limitations," the ALJ enlisted a vocational expert to ascertain whether there are a significant number of jobs in the national economy that Ms. Abrams is capable of performing. That expert concluded that there are indeed a significant number of such jobs in the national economy, such as a dishwasher, cardboard box maker, and handle assembler. R. 17.

Based upon these findings, the ALJ concluded that Ms. Abrams did not have a disability as defined in the Act, from March 3, 2015 through June 12, 2018. R. 18. Ms. Abrams now challenges that decision.

## II.   Factual Record

Ms. Abrams began experiencing anxiety and frustration at work in 2015. R. 288. She reported to medical providers that she was observing racial tensions between herself and her co-workers, R. 288, that she worked a very stressful job in a factory full of men, R. 337, and that when the factory was sold, there were many changes. R. 337.

Ms. Abrams was seen at UAB on March 19, 2015, complaining of homicidal ideation, anxiety, and an inability to cope with stress. R. 410. She stated that her primary care physician put her on Celexa and Xanax, but it was not working well. R. 416. Because she was having homicidal thoughts, Ms. Abrams was placed on leave from her job on March 23, 2015. R. 42.

Ms. Abrams then received inpatient treatment for anxiety and depression at Trinity Medical Center from March 23, 2015 to March 27, 2015, complaining of problems at work and in her marriage and homicidal and suicidal thoughts. R. 260, 264, 288-89. Ms. Abrams was tearful, dysphoric, and labile upon admission and stated "I just feel betrayed, betrayed by the people I've been working with, and I'm still having these bad thoughts, thoughts I'd want to hurt somebody at that plant." R. 261. At the time of discharge, Ms. Abrams was pleasant, attentive, and cooperative. R. 277.

Ms. Abrams was seen at Grayson and Associates, P.C. on April 8, 2015 and referred to admission at St. Vincent's East. R. 318. Ms. Abrams received inpatient treatment at St. Vincent's East from April 9, 2015 to April 13, 2015 after reporting worsening depression and flashbacks with homicidal ideation. R. 315-16. Dr. Simon McClure, who is a physician at Grayson and Associates, P.C., stated in the discharge summary from that admission that Ms. Abrams stopped taking anti-depressants after she felt better and had since had a worsening of depression with homicidal and suicidal ideation. R. 316. She was discharged after her condition improved and "[a]ll parties agreed that she was 'much better and ready to go.'" R. 316. At discharge, Ms. Abrams did not have psychotic features, hallucinations, delusions, paranoid thoughts, or suicidal or homicidal thoughts. R. 316. Additionally, the discharge summary prepared by Dr. McClure shows that she was "thinking clearly, behaving

7

properly, and functioning well" and "had better insight, better judgment, better coping skills, and was not impulsive." R. 316. Dr. McClure noted at discharge that Ms. Abrams's prognosis was excellent and that she "was able to make decisions and manage her behavior and control her urges and follow instructions." R. 316-17.

Ms. Abrams returned to work on June 23, 2015 and was terminated on July 5, 2015. R. 346. Ms. Abrams next received inpatient treatment at St. Vincent's East from September 11, 2015 to September 16, 2015 after reporting worsening depression, "being angry," and homicidal thoughts toward her husband. R. 244, 246. She was discharged after her condition improved and "[a]ll parties agreed that she was 'much better and ready to go.'" R. 244. At discharge, Ms. Abrams's symptoms were improved, and she did not have psychotic features, hallucinations, delusions, paranoid thoughts, or suicidal or homicidal thoughts. R. 244. Additionally, the record shows that she was "thinking clearly, behaving properly, and functioning well" and "had better insight, better judgment, better coping skills, and was not impulsive." R. 244. Dr. McClure noted at discharge that Ms. Abrams's prognosis was good and that she "was able to make decisions, manage her behavior, control her urges, abstain from drugs and alcohol and follow instructions." R. 244-45.

Ms. Abrams also received outpatient care in 2015 from Grayson and Associates, P.C., including care by Dr. McClure, for her work and family troubles. R. 342-360, 443.

Ms. Abrams was next seen at Cooper Green Mercy on July 7, 2016 and prescribed medication. R. 446. Ms. Abrams then reported to the UAB Emergency Department on July 8, 2016, though, stating she had been off her medicine for two months and had been to Grayson and Associates, P.C. for refills but her appointment was cancelled. R. 372. The reason for cancellation is unclear in the record. There is evidence that the cancellation was "due to altercation with another [patient] while in waiting room," and evidence that Ms. Abrams threatened an employee who refused to refill her Xanax. R. 372, 380. Ms. Abrams did not stay overnight at UAB. R. 380.

Ms. Abrams was next seen at Cooper Green Mercy on December 6, 2016 for a psychiatric diagnostic evaluation. R. 439. She reported "not feeling well and looked angry." R. 439. Ms. Abrams became "verbally abusive and appeared to show physical aggress[ion]" while "seeking a benzo." R. 439. Security was called, and Ms. Abrams agreed to leave the office after being informed that "she may follow up with the psychiatrist and make a return appointment to discuss benzos." R. 439.

Ms. Abrams returned to treatment at Grayson and Associates, P.C. in January 2017, and the record reflects that she was treated there until January 15, 2018, just two weeks before the administrative hearing. R. 486-96. At a follow-up visit there, on January 3, 2017, Ms. Abrams was angry and depressed, cooperative, and goal-directed with good insight/judgment. R. 496. She was to return to the clinic in four weeks, which she did on January 30, 2017. R. 495-96. Then she also presented as

angry and depressed, cooperative, and goal-directed with good insight/judgment. R.
495. She was to return to the clinic in one week, which she did on February 7, 2017.
R. 494-95. At that visit she complained of poor sleep and poor appetite and was
depressed. R. 494. However, she was cooperative and goal-directed with good
insight/judgment. R. 494. She was to return to the clinic in two weeks, which she
did on February 21, 2017. R. 493-94. At that visit she reported that her eating was
"ok" and her sleep was "fair." R. 493. She was cooperative, euthymic, and goal-
directed with good insight/judgment. R. 493. She was to return to the clinic in six to
eight weeks. R. 493. She returned to the clinic on March 7, 2017, complaining of
poor sleep, depression, and anger. R. 492. While her insight/judgment was good, she
was rambling, depressed, and not cooperative and was to return to the clinic in three
to four weeks. R. 492. On March 29, 2017, Ms. Abrams reported "doing ok" but was
"off/on crying" and reported depression and anxiety. R. 491. She was not
cooperative, but was goal-directed. R. 491. She was to return to the clinic in three to
four weeks, which she did on April 17, 2017. R. 490-91. At that visit, she reported
anxiety and poor memory, but Dr. McClure noted "looks/sounds well!" R. 490. Ms.
Abrams had a cooperative attitude and was goal-directed with good
insight/judgment, but was depressed. R. 490. She was to return to the clinic in seven
to eight weeks, which she did on June 12, 2017. R. 489-90. At that visit, Ms. Abrams
reported poor sleep, nightmares, a short temper, and impulsiveness. R. 489. She was

depressed, anxious, and frustrated and stated that she "grabbed a woman by the neck in gas station the other day for calling me a bitch." R. 489. The treatment notes also reflect that Ms. Abrams spoke of her "fear of having to go back to work is that I may snap[.] I'm not ready or suitable for the work-force." R. 489. She was cooperative, goal-directed and had good insight/judgment, and was to return to the clinic in two weeks. R. 489.

On June 27, 2017, Ms. Abrams reported that she was sleeping and eating well. R. 488. She was cooperative, euthymic, and goal-directed with good insight/judgment. R. 488. She was to return to the clinic in six to eight weeks, and she returned on July 27, 2017. R. 487-88. The visit notes state that at that time she was sleeping and eating well, with no suicidal ideation, homicidal ideation, or psychosis. R. 487. Ms. Abrams was cooperative, euthymic, and goal-directed with good insight/judgment. R. 487. She was to return to the clinic in six months, which she did January 15, 2018. R. 486-87. While she reported being stressed out, depressed, and anxious, she was cooperative, euthymic, and goal-directed with fair insight/judgment. R. 486. She had no plans to hurt others but stated that she wanted "to hurt white people at my old job." R. 486. She was directed to report back to the clinic in six months. R. 486. This is her last visit noted in the record.

## III.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. However, no decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record

12

in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III.   Discussion

Ms. Abrams alleges that the ALJ's decision should be reversed and remanded because the ALJ's determination of Ms. Abrams's residual functional capacity was not based on substantial evidence. Doc. 11 at 8-19. Specifically, Ms. Abrams argues that such determination is devoid of explanations for the nonexertional limitations provided therein; the medical opinions of Dr. Ashley Hampton and Dr. Simon McClure were improperly discounted; the ALJ's recitation of the record contained a factual misrepresentation; and the ALJ improperly discounted Ms. Abrams's subjective complaints. *Id.*

### A.   ALJ's Narrative Discussion of Residual Functional Capacity

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and asses his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The ruling specifically mandates a narrative discussion of "the individual's ability to perform

sustained work activities in an ordinary work setting on a regular and continuing basis … and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence…; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms … on the individual's ability to work." *Id.*

The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his or her findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959-60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Ms. Abrams does not assert that the ALJ did not consider all of the evidence. *See* Doc. 11 at 9-10. Rather, Ms. Abrams asserts the limitations in the ALJ's assessment of her residual functional capacity lack the specificity required by SSR 96-8p. The court is not persuaded by Ms. Abrams's conclusory arguments. Ms. Abrams has not identified any specific alleged impairment or functional limitation that the ALJ failed to consider in assessing her residual functional capacity, and the ALJ set forth specific reasons given for the limitations he determined in evaluating her residual functional capacity.

Indeed, after performing step three in the sequential evaluation, the ALJ specifically noted that his assessment of Ms. Abrams's residual functional capacity reflected the limitations he found in another part of his analysis – namely, his analysis of whether the severity of Ms. Abrams's mental impairments, considered singly and in combination, meet or medically equal the criteria set forth in paragraph B of 20 C.F.R. § 404, Subpart P, Appendix 1 ("the paragraph B analysis"). 20 CFR Part 404, Subpt. P, App. 1 (Listings) § 12.00A.2.b; 20 CFR § 404.1520(d). In the "paragraph B" analysis, the ALJ determined that Ms. Abrams's mental impairment was not medically equivalent to any impairment listed in the applicable regulations (20 CFR 404.1520(d), 404.1525, and 404.1526). R. 14. As the ALJ explained:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual

> functional capacity assessment used at steps 4 and 5 of the
> sequential evaluation process requires a more detailed
> assessment. The following residual functional capacity
> assessment reflects the degree of limitation I have found
> in the "paragraph B" mental functional analysis.

R. 15. In the paragraph B analysis, the ALJ found a moderate limitation in

understanding, remembering, or applying information, interacting with others, and

concentrating, persisting, or maintaining pace; the ALJ cited both Dr. Hampton's

report and Ms. Abrams's husband's third-party function report. R. 14. Further, the

ALJ found a mild limitation in adapting or managing herself; the ALJ cited Ms.

Abrams's husband's third-party function report. R. 14-15.

These findings reflect that the ALJ carefully considered the evidence of Ms.

Abrams's alleged mental impairments in determining her residual functional

capacity. The ALJ then went on to identify six specific conditions reflecting Ms.

Abrams's nonexertional limitations. The ALJ's findings state that Ms. Abrams can:

> 1. Understand and remember short and simple
> instructions, but is unable to [do] so with detailed or
> complex instructions. 2. Do simple, routine, repetitive
> tasks, but is unable to do so with detailed or complex tasks.
> 3. Have no more than occasional contact with the general
> public, and occasional contact with co-workers. 4. Deal
> with changes in work place, if introduced occasionally and
> gradually, and are well-explained. 5. Perform jobs dealing
> primarily with things, not people. 6. Occasionally miss 1
> to 2 days of work per month due to impairments.

R. 15.

Further, the ALJ explained that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and opinion evidence. R. 15. In considering Ms. Abrams's symptoms, the ALJ first determined whether there was an impairment that "could reasonably be expected to produce" Ms. Abrams's symptoms and second evaluated the "intensity, persistence, and limiting effects" of Ms. Abrams's symptoms "to determine the extent to which they limit the claimant's functional limitations." R. 15-16. Specifically, the ALJ considered Ms. Abrams's "depressive symptoms and related limitations." R. 16. The ALJ also discussed the weight given to the medical opinion and medical source statement, as discussed below. R. 16. Notably, the ALJ found limitations even in excess of those reported by Ms. Abrams's husband, who reported that she has a good ability to follow written and spoken instructions and "gets along well" with authority figures such as bosses, but "just has issues with past racism on her jobs." R. 182-83.

The conditions in the residual functional capacity were well-explained and well-supported by medical evidence. Therefore, the court concludes that that ALJ complied with the "narrative discussion requirements" of SSR 96-8p.

### B.    Weight Given to Medical Opinions

The ALJ must articulate the weight given to different medical opinions in the record and the reasons therefore. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d

1176, 1179 (11th Cir. 2011). The weight afforded to a medical opinion regarding the nature and severity of a claimant's impairments depends upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, whether the opinion is consistent with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. § 404.1527(c).

The regulations and case law establish a general preference for assigning greater weight to the opinions of treating medical sources than the opinions of non-treating medical sources, and greater weight to the opinions of non-treating medical sources than the opinions of non-examining medical sources. *See* 20 C.F.R. §§ 404.1527(c)(1)-(2); *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985). Thus, a treating physician's opinion is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).

"Good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis*, 125 F.3d

at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record). On the other hand, the opinions of a one-time examiner or of a non-examining medical source are not entitled to the initial deference afforded to a physician who has an ongoing treating relationship with a plaintiff. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987).

An ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)). Further, an ALJ does not err when it declines to give a medical opinion controlling weight, if the ALJ articulates specific and proper reasons for doing so. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005); *see also Beegle v. Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012). The ALJ is permitted to draw an inference from the completion of part-time work. *See Jones v. Saul*, 2019 WL 7499163, at *10-*11 (N.D. Fla. July 8, 2019) (finding that a history of part-time work is relevant to claimant's residual functional capacity).

Additionally, applicable regulations provide that physicians' opinions on issues such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are

administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d). The court focuses on the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician may be relevant to the ALJ's findings, but they may not be determinative, because the ALJ bears the responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c).

Ms. Abrams asserts that the ALJ gave insufficient weight to the medical opinions of Dr. Ashley Hampton and Dr. Simon McClure. The court will address the opinions of each physician.

### i.   Medical Opinion by Dr. Ashley Hampton

The record contains one opinion from Dr. Hampton, a consultative psychologist. R. 365-71. Dr. Hampton conducted a mental status evaluation on May 12, 2016 after a referral by the SSA. R. 365. As part of the evaluation, Dr. Hampton interviewed Ms. Abrams for approximately one hour and fifteen minutes and reviewed nineteen pages of medical records. R. 365.

Dr. Hampton opined that "Ms. Abrams meets criteria for Post Traumatic Stress Disorder" and recommended that Ms. Abrams receive disability benefits. R. 368. However, Dr. Hampton noted her belief that Ms. Abrams "can understand,

carry out, and remember simple and complex instructions." R. 368. She noted that Ms. Abrams "was cordial and easy to talk with." R. 368. She also stated that Ms. Abrams "may have problems interacting appropriately with co-workers, supervisors, and the public." R. 368. Dr. Hampton noted that Ms. Abrams was angry while talking about her past, spoke in a loud tone of voice, and would likely have difficulty dealing with normal pressures. R. 368. She added that Ms. Abrams is unable to consistently pay for her medication prescribed as part of her mental health treatment, and that when Ms. Abrams is on her medication she is "better equipped to handle normal daily stressors." R. 368.

The ALJ properly gave little weight to Dr. Hampton's evaluation because her conclusion was inconsistent with the exam findings she reported. R. 16, 365-69. In discussing Ms. Abrams's mental status, Dr. Hampton noted the following: "Ms. Abrams was alert to place, person, time, and situation;" "Her immediate, recent, and remote memory appeared intact;" "Her thought process appeared to be intact with no loose associations, tangential information, or confusion;" "Thought content appeared normal throughout the conversation;" "Her judgment and insight appeared intact." R. 367. Additionally, other evidence from the record supports a conclusion contrary to Dr. Hampton's recommendation. *See* discussion *supra* Part II.

Because Dr. Hampton's opinion was not supported by her own evaluation of Ms. Abrams, or the record as a whole, the ALJ could properly reject her opinion.

Additionally, the ALJ stated the weight given to the medical opinion and the reasons for the weight given. R. 16. Substantial evidence supports the ALJ's decision.

### ii.    Medical Source Statement by Dr. Simon McClure

The record contains a medical source statement from Dr. McClure. R. 450-55. Additionally, Dr. McClure is one of Ms. Abrams's treating physicians, and the record contains various treatment notes that he prepared. R. 342, 486-96.

Dr. McClure reported in his clinical findings that Ms. Abrams has trouble remaining calm, emotionally stable, and maintaining focus. R. 450. He provided a prognosis of "fair," and did not identify any specific signs or symptoms of Ms. Abrams. R. 450-51. Dr. McClure indicated that Ms. Abrams is unable to meet the following competitive standards: "Complete a normal workday and workweek without interruptions from psychologically based symptoms;" "Perform at a consistent pace without an unreasonable number and length of rest periods;" "Respond appropriately to changes in a routine work setting;" "Be aware of normal hazards and take appropriate precautions;" "Understand and remember detailed instructions;" "Carry out detailed instructions;" "Deal with stress of semiskilled and skilled work;" "Interact appropriately with the general public;" "Maintain socially appropriate behavior;" "Travel in unfamiliar place;" and "Use public transportation." R. 452-53. Dr. McClure also opined that Ms. Abrams would miss four or more work days per month because of her impairments. R. 455.

The ALJ gave little weight to Dr. McClure's conclusions in the medical source statement, noting that on the same day of the medical source statement, the treating notes state that while Ms. Abrams was depressed, she had a cooperative attitude and appropriate effect. R. 16, 490. Additionally, Dr. McClure's treatment notes both before and after the date of the medical source statement reflect cooperative attitude, R. 486-89, 493-96, euthymic mood, 486-88, 493, and good insight/judgment. R. 487-89, 492-96. Further, his treatment records in 2017 and 2018 indicate that Ms. Abrams's was being treated in an outpatient capacity with progress being made and follow-up visits as infrequent as every six months. R. 486-87. Therefore, substantial evidence supports the ALJ's determination that "the restrictions [Dr. McClure] identified are inconsistent with his treatment records." R. 16.

Additionally, Dr. McClure's notes reflect Ms. Abrams's ability to complete part-time work. The record establishes that Ms. Abrams has worked part time in a janitorial role from January 1, 2017 to at least the date of the administrative hearing, January 31, 2018. R. 16, 39-41, 490. Accordingly, the ALJ correctly found that Ms. Abrams's "work history is clearly inconsistent with the limitations Dr. McClure identified." R. 16. Substantial evidence supports the ALJ's conclusion that Ms. Abrams's history of part-time janitorial work is inconsistent with Dr. McClure's conclusions in his medical source statement.

### C.    ALJ's Representation of the Factual Record

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.* Where there are erroneous statements of fact in the ALJ's decision, those errors are harmless when they do "not affect the ALJ's ultimate determination." *Id.* at 775-76; *see Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding ALJ's errors were harmless when substantial evidence supported ALJ's determination).

Ms. Abrams's arguments regarding the factual record are two-fold. First, Ms. Abrams argues that a factual misstatement in the ALJ's decision "erode[s] any notion that substantial evidence supports his conclusions." Doc. 11 at 16. The ALJ stated that Ms. Abrams "has not been readmitted for inpatient psychiatric treatment," after his discussion of two hospitalizations in 2015, R. 14, but Ms. Abrams was admitted for inpatient treatment in September 2015, R. 243-56. Second, Ms. Abrams argues that the ALJ did not discuss "other records that display evidence of severe antisocial symptoms." Doc. 11 at 16.

The record reflects that the ALJ considered all the hospitalizations as a group, even though the particular statement Ms. Abrams identifies is inaccurate. The

24

hospitalizations were discussed as a group at the hearing in questioning by Ms. Abrams's attorney. R. 46

> Q: And you're in the hospital for about 14 days and then another four just shortly after that and then again in 2015, for five days.
>
> A: Yes.
>
> Q: Was it all these symptoms that you were experiencing and you talked about those homicidal thoughts of - -
>
> A: Yes. The homicidal thoughts.

R. 46. Thus, the ALJ's discussion of two of the three hospitalizations is representative of the record as a whole. Additionally, after discussing the hospitalizations, Ms. Abrams testified that her symptoms "[have] improved, the medication" in the last few years. R. 47. The ALJ's misstatement regarding a lack of additional inpatient treatment does not indicate the entire record was not considered, especially when the omitted incident was one of a series after which Ms. Abrams testified that her symptoms had improved.

With respect to other incidents that Ms. Abrams asserts the ALJ failed to discuss, the record is clear that the ALJ was aware of altercations at Ms. Abrams's current job, because the altercations were the subject of testimony at the administrative hearing. R. 49. Additionally, the ALJ referenced Ms. Abrams's continued treatment by Dr. McClure at Grayson and Associates, P.C. in 2017 and 2018, and treatment notes from those visits include discussions of anger incidents.

R. 16, 486-90. Accordingly, the ALJ considered the record as a whole. In any event, the ALJ specifically limited Ms. Abrams's residual functional capacity to take into account her nonexertional limitations, including those of dealing with people.

Ms. Abrams asserts that the ALJ erroneously concluded "that Plaintiff has no restrictions whatsoever on her ability to get along with and take direction from supervisors and remains capable of interacting with the general public and coworkers for up to a third of the workday." Doc 11 at 17. But, the ALJ emphasized Ms. Abrams's limitations in working with people in the residual functional capacity by specifying that during a workday, Ms. Abrams can: "3. Have no more than occasional contact with the general public, and occasional contact with co-workers….5. Perform jobs dealing primarily with things, not people." R. 15. Social Security Ruling 83-10 ("SSR 83-10") defines "occasionally" to mean "occurring from very little up to one-third of the time." SSR 83-10 at *5, 1983 WL 31251 (Jan. 1, 1983). These limitations are consistent with the medical records, Ms. Abrams's testimony regarding her ability to work part time and perform certain activities such as going to the grocery store, and Ms. Abrams's testimony that her attentiveness was the reason she could not work full time. R. 40, 47-51. In fact, Ms. Abrams's testimony concerning her attentiveness was apparently considered by the ALJ when he further found that she was limited to jobs not involving "detailed or complex instructions." R. 15.

The ALJ's decision demonstrates that he considered the entire record and did not cherry-pick facts. He assessed medical records from January 2015 through January 2018 and cited them throughout his findings. R. 13-16, 486. The ALJ analyzed the complete reports of Dr. Hampton and Dr. McClure in sufficient depth to identify internal inconsistencies in those documents; he considered Ms. Abrams's husband's statements regarding her limitations and work; and he relied on the testimony of the vocational expert. The ALJ's findings are supported by substantial evidence.

### D.     ALJ's Analysis of Ms. Abrams's Subjective Complaints

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017

WL 5180304, at *3-*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225-26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7-*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210.

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548-49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d

780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the Plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Ms. Abrams argues that "the ALJ failed to perform any analysis whatsoever of Plaintiff's subjective complaints," but she does not enumerate which subjective complaints the ALJ failed to consider or what medical evidence confirms the severity of her symptoms. Doc. 11 at 18-19. Ms. Abrams testified to having past homicidal thoughts, anxiety, panic attacks, weight loss, sleep trouble, an inability to control her temper, an inability to work with others, inattentiveness, difficulty focusing, and forgetfulness. R. 42, 46-47, 50, 52. She also stated that while she works part time, cleans, and occasionally goes to the grocery store, she lays in bed all day. R. 52. Importantly however, the record reflects a lack of inpatient hospitalizations since September 2015 and continued mental health treatment on an outpatient basis with follow-up visits stretching out to every six months. R. 486-87. And by Ms. Abrams's own testimony, her condition has improved in the last few years. R. 47.

The ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." R. 15. The ALJ expressly stated that he "considered the claimant's depressive symptoms and related limitations." R. 16. The ALJ considered her symptoms when making the finding that her depressive and anxiety disorders were severe. R. 13-14. And, the ALJ accounted for Ms. Abrams's subjective complaints when he incorporated into his residual functional capacity nonexertional limitations correlating to these complaints. R. 15. Accordingly, there is no error in the ALJ's consideration of Ms. Abrams's subjective complaints.

## VI.  Conclusion

The court concludes that the ALJ's determination that Ms. Abrams is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this 29th day of September, 2020.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE